**Rafael OBERTI, by his parents and next friends Carlos and Jeanne OBERTI, et al., Plaintiffs,**

**v.**

**BOARD OF EDUCATION OF the BOROUGH OF CLEMENTON SCHOOL DISTRICT, et al., Defendants.**

**Civ. A. No. 91–2818.**

United States District Court, D. New Jersey.

Aug. 17, 1992.

---

Frank Laski, Penelope A. Boyd, Philadelphia, Pa., for plaintiffs.

Thomas J. Murphy, Marlton, N.J., for defendants.

## OPINION

GERRY, Chief Judge.

This matter arises under the Individuals With Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400–85, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794. We have jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(e)(4)(A).

The history of this case is set out in our opinion of April 24, 1992, where we denied cross-motions for summary judgment, and we do not repeat it here. *See Oberti v. Board of Education*, 789 F.Supp. 1322 (D.N.J.1992). In short, Rafael Oberti is an eight year old child with a disability. Due to the nature of this disability, and based upon the allegation that his disruptive behavior precludes placement in a less restrictive setting, defendants (the "School District") have concluded that Rafael can only be educated in a self-contained special education class, in this case located outside of the school district. Rafael's parents seek

an inclusive placement, wherein special education and related services will be provided to Rafael within the matrix of a regular classroom setting in his neighborhood school. On March 15, 1991, an administrative law judge ("ALJ") of the New Jersey Office of Administrative Law held that the segregated placement chosen by the School District was the least restrictive environment, closest to home for Rafael at that time. This lawsuit followed.

On May 26, 27, and 28, 1992, a bench trial was held in this court. *See* 20 U.S.C. § 1415(e)(2) ("In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."). Having reviewed the entire administrative record, and having heard substantial additional evidence, we now present our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) and enter judgment in favor of plaintiffs and against defendants pursuant to Fed. R.Civ.P. 58.

## I. FINDINGS OF FACT

1. Rafael Oberti is a child with a developmental disability associated with Downs Syndrome. As a result, his intellectual functioning and his ability to communicate verbally are severely impaired.[1]

2. Prior to his entry into kindergarten, as required by state regulations, Rafael was evaluated and classified by the School District's Child Study Team, and his eligibility to receive special education and related services was established.[2]

3. As a result of these evaluations, the Child Study Team recommended a number of segregated, self-contained special education programs outside of the school district for Rafael's 1989–90 kindergarten year. Although Rafael's parents requested consideration of a less restrictive placement for Rafael, the School District failed to give serious consideration to this possibility before making more restrictive recommendations.

4. Rafael's parents visited a number of the special education programs recommended by the School District and rejected them. Subsequently, an agreement was reached between the parties whereby Rafael would attend a non-special education class each morning and a special education class each afternoon.[3] Accordingly, he was placed in the Clementon Elementary School developmental kindergarten for the morning session, a class for children not quite ready for kindergarten; and in the Pine Hill School District's special education class for children classified as "preschool handicapped" for the afternoon session. The School District was reluctant to assign Rafael to the developmental kindergarten, but, on a trial basis, acceded to the wishes of Rafael's parents, who advocated for the least restrictive and most normalized setting possible.

5. The Individualized Education Plan ("IEP") developed by the School District for Rafael's 1989–90 kindergarten year provided that all academic objectives were as-

---

**1.** Dr. Lou Brown, professor of special education at the University of Wisconsin, who testified on behalf of Rafael, stated that Rafael's intellectual disability places him among the lowest one percent of the population with respect to intellectual functioning.

There is no question that Rafael has a disability as defined by the IDEA. *See* 20 U.S.C. § 1401(a)(1)(A).

**2.** Pursuant to state regulations, *see* N.J.A.C. 6:28–3.5, and despite the fact that these regulations purport to "[p]revent[ ] ... needless public labeling of educationally handicapped pupils," N.J.A.C. 6:28–1.4(a)(2), in order to be eligible for special education each child must be classi-

fied. Accordingly, Rafael was classified, and, over the years, reclassified a number of times. First he was classified as "preschool handicapped," then "educable mentally retarded," and finally "multiply handicapped." We note that there appears to be a connection between classification changes and placement in special education classes which are designated for children with particular classifications.

In any case, the parties have not disputed Rafael's classifications, and we do not find them either meaningful or relevant to the issues before us.

**3.** Pursuant to state law, Rafael was entitled to a four hour per day program.

signed to the afternoon special education class. The experience in the developmental kindergarten was provided in order to give Rafael the opportunity to observe, model, and socialize with children without disabilities, although the teacher did make some efforts to modify the curriculum for him.[4] Rafael received speech therapy in the Clementon Elementary School during the year. In November of the school year, Rafael's parents requested that an aide be added to the class to assist Rafael, and in March the School District added an aide.

6. The IEP developed for the 1989–90 school year did not contain provisions for behavior management or toilet training in the developmental kindergarten, and it did not provide for communication between the developmental kindergarten teacher and the special education class teacher. Additionally, the IEP did not provide for, and the developmental kindergarten teacher did not receive, any structured special education consultation during the year.

7. Rafael made progress, academically, socially, emotionally, and with respect to language development, in both the developmental kindergarten and in the special education class.

8. Rafael exhibited certain inappropriate behaviors in the developmental kindergarten class, such as throwing temper tantrums and crawling under tables. Occasionally, the teacher required the assistance of an adult from outside the classroom to help remove Rafael from under a table. Additionally, Rafael presented toilet training problems in the class.

9. While there is evidence to support the contention that on occasion Rafael acted aggressively during the year, we find that the record does not support the School District's assertion that Rafael represented a threat or danger to other people. Moreover, while Rafael clearly was difficult to manage at times, the record does not support the School District's assertion that his behavior disrupted the class to the point that the education of the other children in the class was significantly impaired.

10. The School District made informal, *ad hoc* efforts to manage and contain Rafael's behavior problems and toilet training problems, and these efforts were inadequate either to diminish or contain those problems.

11. Rafael did not present behavior problems in the afternoon special education class.

12. Largely based upon Rafael's experience in the developmental kindergarten, the School District proposed to place Rafael in an out-of-district, self-contained special education class for children classified as "educable mentally retarded" for the 1990–91 year.

13. The School District's consideration of less restrictive alternatives for the 1990–91 school year was perfunctory.

14. Irrespective of Rafael's behavior problems, the School District concluded that Rafael needed to be educated in a self-contained special education class, and could not properly be educated within the matrix of a regular classroom setting, based solely upon the level of his intellectual functioning.[5]

15. There was no self-contained special education class within Clementon that the School District considered appropriate for Rafael.

16. Rafael's parents objected to the self-contained, out-of-district placement proposed by the School District for the 1990–91 school year, and requested that Rafael be placed in a regular kindergarten in his home elementary school.[6] The School District rejected this request, and Rafael's parents requested a state due pro-

---

**4.** This teacher estimated that Rafael was able to follow up to 25% of the developmental kindergarten regular curriculum.

**5.** The School District's position is that inclusion is only appropriate for children whose cognitive disabilities are substantially less severe than Rafael's, where the discrepancy between such children and the nondisabled children is substantially reduced.

**6.** In many cases, the developmental kindergarten program fed into the regular kindergarten program at Clementon Elementary School.

cess hearing. *See* 20 U.S.C. §§ 1415(b)(2) & (c); N.J.A.C. 6:28–2.7.

17. As a result of mediation, Rafael's parents and the School District agreed that Rafael would enter a special education class for children classified as "multiply handicapped" in the Winslow Township School District ("Winslow").[7] As part of this agreement, the School District promised to consider mainstreaming possibilities at Winslow as well as to explore a future more inclusive placement at Clementon. Accordingly, a mediation agreement was executed and the 1990–91 IEP was modified to reflect this placement.

18. While at Winslow, no meaningful mainstreaming opportunities were made available and, for the most part, Rafael remained in the segregated, self-contained, special education class with other children with disabilities. Although there is evidence that Rafael also exhibited behavior problems in the Winslow program, at least in a diminished form, these were successfully contained by, among other things, a behavior management plan implemented there.

19. The Winslow placement provided a "multi-sensory" educational approach and integrated Rafael's speech, physical, and occupational therapy into his classroom experience.

20. Despite the School District's insistence to the contrary, plaintiffs' experts persuaded us that a similar multi-sensory approach, with integrated therapies, could be implemented successfully within the matrix of a regular classroom setting.[8]

21. In December of 1990, as a result of their disappointment with the Winslow program, Rafael's parents requested a due process hearing, renewing their request for Rafael to be placed in a regular class in his neighborhood school. A two day hearing was held in February of 1991, and a decision favorable to the School District was rendered on March 15, 1991.

22. In June of 1991, the School District unilaterally proposed to place Rafael for the 1991–92 school year in the Winslow school in a self-contained special education class for children classified as "neurologically impaired."[9]

23. In the summer of 1991, Rafael's parents enrolled Rafael in Clementon's summer enrichment program, which is a non-special education program open to all Clementon elementary school age children. During this program, Rafael presented behavior problems similar to those exhibited in the developmental kindergarten.

---

**7.** This placement involved travel time on a school bus for up to 45 minutes each way.

**8.** There is no evidence in the record that the School District has ever attempted to implement this type of inclusive educational program within a regular class in the District. We note that the School District has argued, and has presented expert testimony in support of its position, that as a matter of educational philosophy it opposes this type of inclusive approach because it either turns the regular class into a special education class or it segregates a child with a disability within the regular class.

**9.** On July 22, 1992, after trial of this matter, the School District filed a motion to open the record pursuant to Fed.R.Civ.P. 60(b)(1) and our local Rule 44, and to admit into evidence missing pages of an exhibit which had been represented as Rafael's 1991–92 IEP. The basis for the motion was that the omission was inadvertent. Plaintiffs opposed this motion, arguing that they would be prejudiced by the post-trial admission of this material because they would be deprived of the opportunity to cross-examine the School District's witnesses with respect to the document. Additionally, plaintiffs pointed out that at trial they had objected to admission of the document because it was incomplete. In reply, the School District pointed out that a complete copy of the document had been produced to plaintiffs during discovery, that plaintiffs had used the complete document during a deposition of one of the School District's experts, and that at trial plaintiffs were in possession of a complete copy of the exhibit and could have referred to it on cross-examination.

There is no indication in the record that during discovery plaintiffs cross-examined the School District's witnesses with respect to the missing pages of the exhibit at issue here. In light of the fact that plaintiffs objected at trial to admission of the document, pointing out that it was incomplete, and thereby afforded defendants an opportunity at the time to introduce the complete document, we are inclined to credit the objection that admitting the document at this point would be prejudicial. Accordingly, defendants' motion as to this document will be denied.

24. In the fall of 1991, Rafael's parents placed him in a special education class for children with perceptual impairments at the St. Luke's School in Stratford, New Jersey. Within three weeks, Rafael was asked to leave this program because of behavior problems similar to those exhibited in the developmental kindergarten.

25. In October of 1991, Rafael's parents began to educate Rafael at home.

26. For the 1992–93 school year, the School District proposed placing Rafael in a self-contained special education class outside of the school district for children classified either as "educable mentally retarded" or "multiply handicapped." [10]

27. The record does not support the School District's contention that at this point in time Rafael would present behavior problems if included within a less restrictive school placement with appropriate supplementary aids and services. [11]

28. Rafael's behavior problems in Clementon's developmental kindergarten were exacerbated and remained uncontained due to the School District's failure to provide him with adequate supplementary aids and services and an appropriate IEP for that placement. The record clearly supports the fact, and the School District concedes, that when provided with such services, such as during the Winslow placement, Rafael's behavior problems diminish and become containable.

29. There are professionally recognized methods and techniques by which educational experiences in regular classrooms can be modified so students like Rafael can benefit from participating in them, without interfering with the education of nondisabled students. Many universities around the country have been engaged in training regular and special education personnel to implement these methods and techniques. As a result, many school districts around the country, including many in New Jersey, use special and regular education teams, consultants, and itinerant teachers to serve students like Rafael in regular education settings. Technical assistance teams and consultants are available to assist communities in New Jersey to develop and implement such programs.

30. Parallel instruction is one of a variety of techniques utilized when children with disabilities are appropriately included within regular classes. [12] The School District has remained closed-minded regarding the possibility of implementing a variety of other available inclusive techniques, and has overstated the degree of parallel instruction that must occur in order to provide Rafael with an inclusive placement.

31. The State of New Jersey has encouraged school districts to "make available the option of regular class placement with supports for all pupils for whom it would be appropriate," and has provided those school districts with information and training on developing inclusive education programs. Plaintiff's Exhibit 14, Memorandum of Jeffrey V. Osowski, Director, Division of Special Education, February 6, 1992.

32. Rafael and children like him may be harmed by being placed in segregated classes, away from friends and family, and surrounded by inappropriate role models.

10. On July 22, 1992, after trial of this matter, the School District filed a motion to open the record and to admit into evidence a proposed IEP for the 1992–93 school year for Rafael. Plaintiffs have not opposed admission of this document. However, they contend that it is not an IEP because it was unilaterally developed by the School District "without any considerations for the substantive and procedural requirements which attend an IEP." Additionally, plaintiffs request that the document be admitted in the complete form in which it was submitted to Rafael's parents.

We agree that the document should be considered only in its complete form. In light of the fact that its admission is not opposed by plaintiffs, and in the interest of creating a complete record, we will grant the School District's motion, but will include the complete document, as submitted by plaintiffs, in the record.

11. We note that Rafael successfully has been participating in various social, recreational, and church activities, including a T-ball league and a bowling league.

12. Parallel instruction means that the child remains within the classroom, but works on tasks different than the rest of the class.

33. Success in special schools and special classes is unlikely to lead to Rafael functioning successfully either in integrated education settings or in the community.

34. Rafael and all children with disabilities need access to integrated experiences where they can learn to function effectively. Correspondingly, nondisabled people need to learn to function with disabled people through such experiences.

35. Inclusive public education for children with disabilities offers substantial benefits for children with disabilities, for their nondisabled peers, as well as for the community at large. This type of education increases the opportunities for individuals with disabilities to become fully-functioning, co-equal members of society.

## II. CONCLUSIONS OF LAW

### A. *The IDEA*

1. Our review of this matter is "something short of a complete *de novo* review of the state educational program," *Colin K. by John K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983), because we are required to give "due weight" to the findings and conclusions reached in the administrative proceeding. *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Nevertheless, after consideration of the record below, and based upon a preponderance of the evidence, we are "free to accept or reject the findings in part or in whole." *Town of Burlington v. Department of Education*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

2. As a condition of receiving federal funding,[13] states must comply with the provisions of the IDEA, the purpose of which is:

to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. § 1400(c).

3. The statute explains that:

The term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

*Id.* § 1401(a)(18).

4. In order to determine whether an "appropriate" education has been provided, we ask first whether "the state has complied with the procedures set forth in the Act[.]" *Rowley*, 102 S.Ct. at 3051. Second, we ask whether "the individualized education program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits."[14] *Id.*

5. The centerpiece of the statutory requirements of the IDEA is the Individualized Education Program ("IEP"), in which the school district must identify the program it develops for meeting the unique needs of every child with a disability. *See*

---

**13.** New Jersey is a participating state under the IDEA. *See Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District*, 116 N.J. 30, 34, 560 A.2d 1180, 1182 (1989).

**14.** An appropriate education must provide access to education "sufficient to confer *some educational benefit*" upon children with disabilities. *Rowley*, 102 S.Ct. at 3048 (emphasis supplied).

The Third Circuit has interpreted this to mean that "the ... [IDEA] calls for more than a trivial educational benefit" or "more than *de minimis*" benefit. *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180, 182 (3d Cir. 1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989).

*Honig v. Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988). As described by the Eleventh Circuit:

> The IEP is developed at a meeting among qualified officials, the child's teacher, the child's parents or guardians, and, when appropriate, the child. It must include, among other things, statements of the child's present level of educational performance, annual goals for the child, the specific educational services to be provided the child, and the extent to which the child will be able to participate in regular education programs. School officials must convene a meeting at least annually to review and, when appropriate, revise the IEP. As this court has recognized, 'the IEP is more than a mere exercise in public relations. It forms the basis for a handicapped child's entitlement to an individualized and appropriate education.' Thus, the importance of the development of the IEP to meet the individualized needs of the handicapped child cannot be underestimated.

*Greer v. Rome City School District,* 950 F.2d 688, 694–95 (11th Cir.1991) (*quoting Doe v. Alabama State Department of Education,* 915 F.2d 651, 654 (11th Cir.1990)), *opinion withdrawn on other grounds,* 956 F.2d 1025 (11th Cir.1992). *See also* 20 U.S.C. § 1401(a)(20); 34 C.F.R. §§ 300.343–46; N.J.A.C. § 6:28–3.6.

6. The IDEA also states that schools must establish procedures:

> to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B). Thus, "Congress created a statutory preference for educating handicapped children with nonhandicapped children." *Greer,* 950 F.2d at 695. *See also Board of Education, Sacramento City Unified School District v. Holland,* 786 F.Supp. 874, 877–78 (E.D.Cal.1992) (the Act's preference for mainstreaming "rises to the level of a rebuttable presumption").

7. The IDEA requires participating school districts to provide "a continuum of alternate placements ... available to meet the needs of" children with disabilities. 34 C.F.R. § 300.551. Accordingly, there must be available, at one end of the continuum, completely segregated placements within separate schools, and, at the other end, placements within regular classes in public schools.

When a child with a disability is placed as a full member of a regular class, with the provision of "supplementary aids and services," this is known as supported inclusive education ("inclusion"). The middle of the continuum contains mixed placements in which a child might be a member of a regular class but obtain certain supplementary services in a separate "resource room," or where he or she might be a member of a self-contained special education class, but spend portions of time "mainstreamed" in regular classes or along with nondisabled students in other school activities such as recreation or lunch. *See Daniel R.R. v. State Board of Education,* 874 F.2d 1036, 1050 (5th Cir.1989). Federal regulations require that each IEP specify "the extent to which the child will be able to participate in regular educational programs." 34 C.F.R. § 300.346(c).

An inclusive education program, where a child with a disability becomes a member of a regular class, does not imply that all special service delivery must occur within the regular class. For instance, resource room support, or other special services, may be delivered on a pull-out basis, within the regular class, or a combination of the two, depending upon the needs of the child and the class as determined by the teachers and team involved.

8. The IDEA incorporates a "least restrictive environment" requirement. Accordingly, "[t]o the maximum extent appropriate" children with disabilities must be

included in regular classroom settings, as close to home as possible. *See* 34 C.F.R. § 300.552(a)(3); N.J.A.C. 6:28–2.10(a)(3) and (5). This requirement is met when a child with a disability becomes a full member of a regular class or when a child who cannot be fully included is mainstreamed to the "maximum extent appropriate."

9. School districts therefore must consider placing children with disabilities in regular classroom settings, with the use of supplementary aids and services, including classroom assistants, *before* exploring other, more restrictive, alternatives. *See Greer*, 950 F.2d at 696 ("before the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom"); *Daniel R.R.*, 874 F.2d at 1048 ("First we ask whether education in the regular classroom with the use of supplementary aids and services, can be achieved satisfactorily.").

10. With respect to the mainstreaming requirements of the IDEA, we agree with the Sixth Circuit, which, in *Roncker v. Walter*, 700 F.2d 1058 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983), stated:

> The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate. In a case where the segregated facility is considered superior, the court should determine whether the services which make the placement supe-

rior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act. *Id.* at 1063 (citation omitted).

▪ 11. Thus, in collaboration with the parents, a school district must make a threshold determination as to what special services a child with a disability needs and then must determine whether those needs can be met within the matrix of a regular classroom setting with the provision of supplementary aids and services. As noted by the Eleventh Circuit:

> [B]efore the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations promulgated thereunder to make provision. Only when the handicapped child's education may not be achieved satisfactorily, even with one or more of these supplemental aids and services, may the school board consider placing the child outside of the regular classroom.[15]

*Greer*, 950 F.2d at 696.

▪ 12. School districts must carefully examine the educational benefits, both academic and nonacademic, available to a child with a disability in a regular classroom. Among the factors to be considered are the advantages derived from modeling the behavior and language of children without disabilities;[16] the effects of such inclusion

---

**15.** In order to accomplish the IDEA's mainstreaming requirements, schools must "hire various specially trained personnel to help handicapped children," *Irving Independent School District v. Tatro*, 468 U.S. 883, 893, 104 S.Ct. 3371, 3377, 82 L.Ed.2d 664 (1984), such as physical, occupational, and speech therapists. *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 176 (3d Cir.1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); 20 U.S.C. § 1401(a)(16). Additionally, a school district must assign a supplementary teacher's assistant to a regular classroom, on a full or part-time basis, if necessary to accommodate

the special needs of included children with disabilities. *See, e.g., Department of Education, State of Hawaii v. Katherine D.*, 727 F.2d 809, 813 (9th Cir.1983) (aide ordered for child with cystic fibrosis), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985).

**16.** Academic performance can be positively affected by the nonacademic benefits of mainstreaming, such as improved self-esteem and increased motivation. *See Holland*, 786 F.Supp. at 879. *See also Daniel R.R.*, 874 F.2d at 1049 ("[T]he language and behavior models available from nonhandicapped children may be essential

upon the other children in the class, both positive and negative; and the cost of necessary supplementary services. *See Greer,* 950 F.2d at 697; *Barnett v. Fairfax County School Board,* 927 F.2d 146; 153–54 (4th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Daniel R.R.,* 874 F.2d at 1048–50.

13. The preference or presumption in favor of inclusion will not be rebutted unless the school district shows either that the child's disabilities are so severe that he or she will receive little or no benefit from inclusion; that he or she is "so disruptive as to significantly impair the education of other children" in the class; or that the cost of providing an inclusive education "will significantly affect other children in the district." *Holland,* 786 F.Supp. at 874.

14. In order for a school district to justify its exclusion of child with a disability from a regular classroom on the basis of disruptiveness, the school district must show that despite the assistance of supplementary aids and services, and "after taking all reasonable steps to reduce the burden to the teacher, the other children in the class will still be deprived of their share of the teacher's attention." *Holland,* 786 F.Supp. at 879. The education of the other children must be "significantly impaired" by the inclusion of the child with a disability to justify exclusion on this basis. *Id. See also* 34 C.F.R. § 300.552, Comment (*quoting* regulations for section 504 of the Rehabilitation Act, 34 C.F.R. § 104, app. ¶ 24).

15. Curriculum modification is contemplated by the IDEA. *See Holland,* 786 F.Supp. at 879 ("The IDEA, in its provision for the IEP process, contemplates that the academic curriculum may be modified to accommodate the individual needs of handicapped children."). The need to modify a curriculum to accommodate a child with a disability may become a factor justifying the exclusion of such a child from a regular class only when it bears upon other legitimate factors that may be considered, such

or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the

as the possible negative effects upon the other students in the class of including a particular child with a disability within the class. *See id.* at 879–80.

16. Although the substance of educational decisions must, whenever possible, be left to the expertise, discretion, and creativity of local school officials, *see Daniel R.R.,* 874 F.2d at 1046, school districts carry the burden of justifying challenged placements. *See Davis v. District of Columbia Board of Education,* 530 F.Supp. 1209, 1211–12 (D.D.C.1982); *Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District,* 116 N.J. 30, 44, 560 A.2d 1180, 1188 (1989).

17. With respect to mainstreaming, the court must determine whether a school system's efforts to provide supplementary aids and services are "sufficient." *Daniel R.R.,* 874 F.2d at 1048. "The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Id.*

18. In this case, the School District must convince the court that Rafael cannot be educated within the matrix of a regular class in his neighborhood school with supplementary aids and services, that he needs to be placed in a self-contained special education class, and that in fact he is not ready for any degree of mainstreaming.

19. The School District initially violated the IDEA by failing to consider less restrictive placements for Rafael's 1989–90 kindergarten year.

20. More significantly, the School District violated the IDEA by failing to provide adequate supplementary aids and services to Rafael during his year in the developmental kindergarten. For instance, the School District placed Rafael in that class without a curriculum plan, without a behavior management plan, and without providing adequate special education support to the teacher.

regular education curriculum, he may benefit from nonacademic experiences in the regular education environment.").

The School District has argued that it was surprised by Rafael's behavior problems, including his toilet training difficulties. Even if such was the case, this did not relieve the School District of its responsibility to develop an appropriate plan to manage such problems once they presented themselves. *See* 34 C.F.R. §§ 300.343, 300.534.

Finally, the School District argues that once those problems became apparent, plans to deal with them were informally developed. However, these plans clearly were inadequate for the task, and failed to provide a level of supplementary aids and services reasonably calculated and sufficient to provide Rafael with an appropriate education as required by the IDEA.

■ 21. The behavior problems Rafael exhibited in the developmental kindergarten clearly were exacerbated and remained uncontained due to the inadequate level of services provided there. Accordingly, the School District improperly justified Rafael's exclusion from less restrictive placements in subsequent years based upon those behavior problems.

22. While Rafael also presented behavior problems in various other settings, in settings where an adequate level of supplementary aids and services were provided, those behavior problems diminished and were contained.

23. There is nothing in the record which would suggest that at this point in time Rafael would present similar behavior problems if provided with an adequate level of supplementary aids and related services within the matrix of a regular education class. In fact, the record supports the opposite conclusion.

24. While inclusion in a regular class clearly would require the School District to modify the curriculum in order to provide Rafael with an "appropriate education,"

one that confers educational benefit and makes his experience there meaningful, *see Rowley*, 102 S.Ct. at 3043, 3048; *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180, 182 (3d Cir.1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989), this alone is not a legitimate basis upon which to justify excluding a child from such an experience.

■ 25. The School District has failed to demonstrate that providing a modified curriculum for Rafael within the matrix of a regular class would be too costly or would significantly interfere with the education of other children in the class. Moreover, the School District has failed to demonstrate that the type of program implemented and services provided in the Winslow special education class cannot feasibly be provided in a more inclusive setting.[17] *See Roncker*, 700 F.2d at 1063 ("the court should determine whether the services which make the [segregated] placement superior could be feasibly provided in a nonsegregated setting").

26. As a matter of educational philosophy, the School District contends that it is not appropriate to educate children with intellectual disabilities as severe as Rafael's within the matrix of regular education classes.[18] Thus, the School District admittedly remains unwilling to consider techniques and educational methodologies which have been developed to enable schools to accommodate children like Rafael in inclusive placements. Of course, the School District's philosophical disagreement with the concept of inclusion does not entitle it to violate the mainstreaming requirements of the IDEA. *See Roncker*, 700 F.2d at 1063.

27. The School District's position in this litigation is that Rafael is either too disruptive or too disabled intellectually to benefit from an inclusive placement. The evidence

---

**17.** Various experts who testified on Rafael's behalf have convincingly refuted the School District's assertion that such services could not be delivered within the matrix of a regular education class without disrupting the class or converting it into a special education class.

**18.** To the extent that the School District automatically refers children with moderate to severe mental retardation to self-contained special education classes, it commits a violation of the provisions of the IDEA which require individualized consideration of the educational needs of each child. *See Daniel R.R.*, 874 F.2d at 1048.

presented by experts testifying in Rafael's behalf convinces us otherwise. Rafael is likely to benefit from an inclusive placement, and nondisabled children in the class will likewise benefit, if an appropriate level of supplementary aids and services are provided by the School District. *See DeVries v. Fairfax County School Board,* 882 F.2d 876, 879 (4th Cir.1989) (children with disabilities can only be excluded from mainstream programming based upon the severity of their disabilities when they would receive little or no benefit from those programs).

28. We reject the School District's assertion that the value obtained by a child with a disability from modelling nondisabled children is equivalent to modelling higher functioning children with disabilities in a special education class. We also reject the School District's assertion that the advantages obtained from modelling nondisabled children may be obtained through Rafael's social and recreational activities in the community. School is one of the most important learning environments for children. In this case, there is no convincing rationale for depriving Rafael of the valuable experience of learning from his nondisabled peers, and learning to interact with them, in school. Likewise, there is no convincing rationale for depriving his nondisabled peers of opportunities of learning from him, and of learning to interact with him, in school.

29. Rafael should not have to earn his way into an integrated school setting by first functioning successfully in a segregated setting. Inclusion is a right, not a privilege for a select few. Success in special schools and special classes does not lead to successful functioning in integrated society, which is clearly one of the goals of the IDEA. *See Polk,* 853 F.2d at 182. We take particular notice of the potential for harm when a child with a disability is educated in a segregated milieu. *See* 34 C.F.R. § 300.552(d) ("[i]n selecting the least restrictive environment, consideration is

given to any potential harmful effect on the child").

30. Our deference to the findings of administrative tribunals does not extend to cases in which the administrative tribunal's conclusions are clearly erroneous. We believe that the ALJ's conclusions in this matter were clearly erroneous because they were largely and improperly based upon Rafael's behavior problems in the developmental kindergarten as well as upon his intellectual limitations, without proper consideration of the inadequate level of supplementary aids and services provided by the School District.

31. The ALJ concluded that "[t]he Clementon CST [Child Study Team] and support services and teacher exhausted all resources available, but failed to help [Rafael] advance to a level of participation which would justify continued efforts at mainstreaming there." The finding that the School District "exhausted all resources available" was clearly erroneous.[19] Accordingly, the ALJ's findings and conclusions cannot stand.

32. The School District's 1990–91 IEP for Rafael, recommending placement in a self-contained, special education class, located out of the school district, and providing no meaningful opportunities for mainstreaming, violated the requirements of the IDEA.

33. The School District's 1991–92 and 1992–92 proposals for Rafael, recommending placement in self-contained, special education classes, located out of the school district, and providing no meaningful opportunities for mainstreaming, violated the requirements of the IDEA.

34. Accordingly, at this time, a new IEP for the 1992–93 school year must be developed.

### B. *The Rehabilitation Act*

 35. Section 504 of the Rehabilitation Act of 1973 provides an independent

---

**19.** The School District's plan for including Rafael in the developmental kindergarten might have been adequate had available resources been properly mobilized. In any case, the IDEA requires school districts with inadequate resources whenever feasible to supplement those resources in order to accommodate children with disabilities.

source of rights for children with disabilities in addition to the IDEA. *See* 20 U.S.C. § 1415(f). The statute states, in relevant part:

> No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[20]

29 U.S.C. § 794(a).

36. In order to make out a *prima facie* case under section 504, plaintiff must prove:

> (1) that he is a "handicapped individual" under the Act (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position sought solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance.

*Strathie v. Department of Transportation,* 716 F.2d 227, 230 (3d Cir.1983).

37. Rafael clearly is an "individual with handicaps" as defined by the Rehabilitation Act. *See* 29 U.S.C. § 706(8).

38. Because age is the only program requirement applicable to public elementary education, *see* 34 C.F.R. § 104.3(k)(2),[21] Rafael is an "otherwise qualified" handicapped individual within the meaning of section 504.

39. The School District admittedly is a recipient of federal funding.

40. The School District has stated that its placement recommendations for Rafael have been based upon his intellectual disability as well as his behavior problems, including toilet training difficulties. These are all manifestations of Rafael's disability. *See* 29 U.S.C. § 706(8); *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 176, 182 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); *Battle v. Pennsylvania,* 629 F.2d 269, 275 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981).

41. Based upon the nature of his disabilities, Rafael has been denied the benefits of education in his local school district, which has required him to attend a self-contained special education class out-of-district without any meaningful opportunity for mainstreaming.[22]

42. Accordingly, plaintiffs have made out a *prima facie* case under section 504.

■ 43. "[O]nce the plaintiff has established a *prima facie* case that he has been discriminated against, the defendant must present evidence to rebut the inference of illegality." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 612 F.2d 644, 649 (2d Cir.1979). *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ 44. The School District must therefore show that placement of Rafael in a self-contained special education class, in this case out of his home school district, is

**20.** A number of courts have linked this anti-discrimination statute with the attack upon segregated education found in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *See, e.g., New Mexico Ass'n for Retarded Citizens, Inc. v. New Mexico,* 678 F.2d 847, 855 (10th Cir.1982). These courts have noted that the accommodation and integration of people with disabilities into programs serving nondisabled individuals, granting them equal opportunity, is one of the central purposes of section 504. *See id.*

**21.** 34 C.F.R. § 104.3(k)(2) provides:

> *Qualified handicapped person* means: With respect to public preschool elementary, secondary, or adult educational services, a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under [the IDEA].

**22.** The School District maintains that because of the severity of Rafael's intellectual disability, he

educationally necessary.[23] *See Board of Education v. Harris,* 444 U.S. 130, 151, 100 S.Ct. 363, 374, 62 L.Ed.2d 275 (1979).

45. In order to establish 'educational necessity,' the regulations require that segregated special education placements must be "necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others." 34 C.F.R. § 104.4(b)(1)(iv). *See also* 34 C.F.R. § 104.4(b)(2) (schools must provide "equal opportunity to achieve the same result, to gain the same benefit"); *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 722, 83 L.Ed.2d 661 (1985).

46. We believe that it makes sense to construe these regulations consistently with the IDEA,[24] and thus conclude that they preclude schools from implementing a segregated special education placement unless such a placement is necessary to confer "some educational benefit" upon a child with a disability. *Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982).

47. In order to exclude a child with a disability from regular education programming, the school district must "reasonably demonstrat[e] that accommodating ... [the] individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds." *Strathie,* 716 F.2d at 231. Moreover, the regulations provide that such a showing is subject to a "least restrictive environment" requirement.

> For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

34 C.F.R. § 104.4(b)(2). *See also New Mexico Ass'n for Retarded Citizens, Inc. v. New Mexico,* 678 F.2d 847, 855 (10th Cir. 1982).

48. Given our holding under the IDEA that Rafael can be accommodated in a regular classroom setting with the provision of appropriate supplementary aids and services, we must necessarily hold that the School District has not offered Rafael the "least restrictive alternative" as required by section 504.

49. The School District has failed to demonstrate that it is necessary to educate Rafael in a self-contained special education class, in this case located out of the district. Moreover, the School District has failed to demonstrate that accommodating Rafael by designing an inclusive individual education program for him within the district would require a modification of the essential nature of the program or place an undue burden upon the School District.[25]

---

must be educated primarily in a segregated special education setting.

**23.** In the context of section 504, we do not defer to state agency fact-finding with respect to educational necessity. *See Wynne v. Tufts University School of Medicine,* 932 F.2d 19, 25–28 (1st Cir.1991); *Carey,* 612 F.2d at 649.

**24.** We note that the regulations implementing section 504, particularly those concerning reasonable accommodation, directly track the language of the IDEA. *Compare* 34 C.F.R. § 104.-34(a) ("A recipient shall place a handicapped person in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily.") *with* 20 U.S.C.

§ 1412(5)(B) (schools must establish procedures "to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily").

**25.** Although the School District has chosen to ignore the section 504 issues in its submissions to the court, we have already dismissed its characterization of the services and modifications necessary to accommodate Rafael in the context of the IDEA. The School District's refusal to

50. As we held in the context of the IDEA, neither Rafael's need for assistance in self-help and toileting, his level of intellectual functioning, or his behavior problems, all manifestations of his disability, justify excluding him from mainstream educational programming.

51. Likewise it is clear that Rafael has benefitted and can continue to benefit from an inclusive education program and that the School District has deprived him of this opportunity solely by reason of his disability.

52. The School District violated section 504 by failing to properly investigate and failing to provide the reasonable accommodations necessary to enable Rafael to benefit from an inclusive education program in his home school district, and by excluding him from regular education programming solely on the basis of his disability.

### III. CONCLUSION

Having found violations of both the IDEA and section 504 of the Rehabilitation Act, the School District's 1990–91 IEP, and its placement recommendations for the 1991–92 and 1992–93 school years, cannot stand. Accordingly, we reach a decision contrary to that reached by the ALJ and send the parties back to the drawing board to design an appropriate IEP for Rafael Oberti for the 1992–93 school year in accordance with this opinion. *See Russell v. Jefferson School District,* 609 F.Supp. 605, 608–609 (N.D.Cal.1985). Additionally, we authorize an award of attorneys' fees to plaintiffs, who have prevailed in this matter. *See* 20 U.S.C. § 1415(e)(4)(B) and 29 U.S.C. § 794a(b).

Although we leave decisions as to educational methodology in the hands of the School District, to be developed in cooperation with Rafael's parents, the School District is not free at this time to recommend a self-contained special education placement

investigate and consider the modifications necessary to accommodate Rafael preclude it from rebutting plaintiffs' evidence that such accommodation would neither change the essential nature of the program nor place an undue burden upon the School District. *See Wynne v. Tufts University School of Medicine,* 932 F.2d 19,

for Rafael. It is now time for the School District to reconsider its position on inclusion for Rafael, and to avail itself of the resources that have enabled school districts around the country and within New Jersey successfully to educate children with moderate to severe disabilities within the matrices of regular education classes.

Both the IDEA and section 504 of the Rehabilitation Act seek to address the problems created by the segregation of individuals with disabilities and compel the type of integration which we are enforcing in this case. While this surely requires readjustment and considerable effort on the part of educators, and on the part of the community in general, it is a small price to pay to increase the opportunity of individuals with disabilities to become fully-functioning, productive, and co-equal members of society, and of individuals without disabilities to learn to live in a world where individuals with disabilities are so included. Accordingly, this is the price which we require of the School District today.

25–26 (1st Cir.1991) (educational institutions must consider technological advances and new approaches to accommodate individuals with disabilities). We note that the School District has not raised cost as an issue which precludes it from designing an integrated program for Rafael.